[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 18-14532
Non-Argument Calendar
_____

D.C. Docket No. 5:15-cv-00310-WTH-PRL


DEXTER C. NEWSON,

                                                    Petitioner-Appellant,


versus


SECRETARY, DEPARTMENT OF CORRECTIONS,
FLORIDA ATTORNEY GENERAL,

                                                    Respondents-Appellees.


_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(December 20, 2019)

Before GRANT, ANDERSON and HULL, Circuit Judges.

PER CURIAM:

Dexter Newson, a Florida prisoner, pro se appeals the district court's denial

of his 28 U.S.C. § 2254 petition.  Newson claims that his trial counsel was ineffective for failing to investigate and call his niece, Angela Newson ("Angel"), as a witness or to investigate and introduce his phone records.  The district court concluded that Newson had not raised those claims in state court, had procedurally defaulted them, and had not shown cause to excuse his procedural default.  This Court granted a certificate of appealability ("COA") on this single issue:

> Whether Newson can show cause and [also] that he has a substantial claim, under Martinez v. Ryan, 566 U.S. 1 (2012), such that a federal habeas court should hear his claim that trial counsel was ineffective in failing to investigate phone records or call a witness, Angela Newson, to testify about the origins of a text message.

After review, we affirm.

## I.  BACKGROUND

### A.    State Trial Evidence

In 2009, Newson was charged with the second-degree murder of Dorian Gaskin.  At trial, Newson testified and admitted that he shot Gaskin.  Newson's defense was that he acted in self-defense or that the homicide was justifiable or excusable under Florida law.  We recount the trial testimony of key witness Mindy Gobel and defendant Newson about how the homicide occurred.

On January 7, 2009, Mindy Gobel was driving her car, with Newson in the passenger seat.  Video surveillance footage from a nearby camera showed Gobel's car heading through a neighborhood towards the scene of the homicide at 5:10 p.m.

2

While driving, Gobel saw children in the street and hit her brakes. Gobel's car stopped near a stop sign. Dorian Gaskin approached the car with a child and began yelling at driver Gobel for driving too fast in a neighborhood with children in the road. Despite Gobel's repeated apologies, Gaskin approached the front of Gobel's car, started to yell, and hit the car. Gaskin then moved to Gobel's side of the car and again told her to slow down. When Gobel tried to leave, Gaskin went back to the front of the car to prevent her from doing so.

Passenger Newson then asked that Gaskin let them go. Gaskin continued to berate them for speeding and refused to let them leave. Gaskin went over to Newson's side of the car, where they continued to argue. Newson reached for the door while he was arguing with Gaskin but then decided stay in the vehicle. This made Gaskin "start[] yelling even louder." Newson testified that he was concerned for his well-being and safety at this point. Gobel, however, testified that Gaskin was mad but did not threaten to hurt them.

As the argument escalated, Gaskin put his hand through Newson's window and "told [Newson], 'You are doing the right thing you pussy motherfucker; you are staying in the car.'" Gaskin then pushed at Newson, backed away from the car, put his hand back through the window a second time, flicked Newson's nose with his finger, and grabbed the car door.

When Gaskin grabbed for the car door, Newson got scared, panicked, and

3

shot Gaskin to ensure his own safety.  Newson shot Gaskin from a distance of between six inches to one foot away.  Newson testified that he had no ill will towards Gaskin.  Newson testified that he shot Gaskin solely to protect himself because he thought (1) that Gaskin was trying to pull him out of the car or get into the car to hurt him and (2) that he had no other option.  Newson admitted that he did not see Gaskin with any gun, knife, or other weapon in his hands.

Gobel, however, did not see Gaskin touch Newson, hit Newson, or attempt to pull Newson out of the car, although she was "looking straight at the time." Further, Gaskin's son testified (1) that Gaskin was near Gobel's car and told them to slow down but (2) that Gaskin never stood in front of the car, never went to Gobel's side of the car, never touched the car, and never argued with them.

Driver Gobel saw Gaskin cover his face after being shot but did not see whether he fell to the ground.  Gobel was shocked by the shooting, hit the gas, and drove to the end of the street.  Once they got to the end of the street, Newson asked Gobel to drop him off at an apartment complex, rather than at his house which was right down the street.  Gobel complied.  According to Gobel, the drop off occurred less than two minutes after the shooting.  After Newson was dropped off, he actively hid from police and stayed at his friend's apartment until at least 7:00 p.m. that night.

The video surveillance footage showed an emergency vehicle heading

4

towards the scene at 5:13 p.m., only three minutes after Gobel's car was seen heading towards the scene. The paramedics received a call at 5:14 p.m. to respond to the scene of the shooting. The paramedics, fire rescue, and police officers arrived at the scene between 5:15 and 5:20 p.m. They found Gaskin lying on the ground, in between the carport and the front door of his mother's house. There were a lot of bystanders yelling and shouting about how Gaskin had been shot. The bystanders and the crime scene evidence indicated that Gaskin was shot and then walked towards his mother's house, which was near the stop sign where the shooting occurred. Gaskin had collapsed in front of the house. His mother was known in the community as "Queen Sim."

The paramedics attempted to treat Gaskin, who was unresponsive. They transported Gaskin to the hospital as they continued their treatment efforts. Gaskin was pronounced dead at the hospital.

The government introduced Gobel's phone records and Gobel confirmed that the records showed that Newson texted her at 5:27 p.m. that same day. Gobel confirmed that Newson's text message stated: "Just reported: Ms. Queen's son has . . . passed away, January 7th, 2009. Be care[ful] in these streets. RIP. I'm da shit." Gobel testified that she received the same text from several people over the next several days. Gobel confirmed that she had personally forwarded the text to other people.

5

Defendant Newson testified and admitted that he sent the text message to Gobel.  However, Newson claimed that he simply forwarded the message to Gobel after receiving it from another person, likely his niece.  Newson believed "I'm da shit" was a "signature"—that is, a word or phrase that would appear at the end of every message someone sent—though he stated that it was not his signature.  Newson testified that someone else sent the text message to his niece's phone and that she forwarded the message to him.  Newson acknowledged, however, that forwarded texts generally "say[] forward at the beginning of the message," that he previously had forwarded texts to Gobel, and that a text he had forwarded Gobel the day before had started with "FWD."[1]

Gobel testified that, on the day of the shooting and the days that followed, Newson texted her asking if she was okay, telling her to lay low, asking her to wash her car and check it for gun shells, asking about her birthday plans, and asking her to hang out.  When the police came to speak with Gobel on January 9, she texted Newson to notify him and he told her to erase all of her text messages, which she did.  Gobel spoke with police officers that day and told them about the shooting, but misled the officers about the shooter's identity.  On January 11,

---

[1]In questioning Newson, the prosecutor then stated, "So, if you had forwarded that text about Ms. Queen's son [having] — passed away, it would have had F-W-D at the beginning," and moved on to another question.  Defense counsel objected and requested that the prosecutor pose the statement as a question to Newson and obtain his response.  The court overruled the objection and the prosecutor moved to a different question.

Gobel returned to the police station and told the officers about Newson's involvement and provided them with his contact information.

Newson came to the police department that night to speak with officers but lied about his involvement. Nevertheless, the officers arrested Newson. Law enforcement watched and listened to one of Newson's recorded jail visits wherein he admitted his involvement in the shooting and to hiding the gun with which he shot Gaskin. Law enforcement obtained a search warrant and discovered the gun.

At trial, Newson conceded that he "did everything [he] could to hide from the police" and to cover up the shooting because he was scared. Newson conceded that he told others that he was at his friend's apartment all day and not at the scene of the shooting, that he told Gobel to erase her text messages, and that he lied to the police about his involvement.

## B.    Closing Arguments, Verdict, and Direct Appeal

In her closing argument, the prosecutor explained to the jury that, to convict Newson of second-degree murder, the State had to prove, among other things, that Newson had the requisite intent—that he killed Gaskin "by an act imminently dangerous to another and demonstrating a depraved mind without regard for human life." The prosecutor explained that, to prove this intent element, the State had to establish each of the following: (1) that "a person of ordinary judgment would know" the act is "reasonably certain to kill or do serious bodily injury to

7

another"; (2) that the act is "done from ill will, hatred, spite, or evil intent"; and (3) that the act "is of such a nature that the act itself indicates an indifference to human life."  The prosecutor argued that Newson's firing a gun at someone nearby alone satisfied both the first and third requirements.

As to the second requirement—whether Newson acted with "ill will, hatred, spite, or evil intent"—the prosecutor argued that the jury should consider what Newson did and said before, during, and after the shooting.  The prosecutor highlighted this evidence: (1) the "I'm da shit" text message Newson sent Gobel soon after the shooting, (2) the other text messages Newson sent Gobel in the days following the shooting, and (3) Newson's efforts to hide his involvement in the shooting.  The prosecutor stressed Newson's texts concerning Gobel's birthday and making plans to hang out, which showed Newson behaving "like nothing untoward had happened the day before."  The prosecutor emphasized how Newson asked Gobel to drop him off somewhere other than at his house, hid the gun, asked Gobel to wash her car and check it for gun shells, and told Gobel to erase her text messages.  The prosecutor argued that Newson's own actions "negate[d] self-defense" because they were "inconsistent with a person who thought he was defending himself."

In his closing argument, Newson's defense counsel made arguments as to all three defenses—justifiable homicide, excusable homicide, and self-defense.

8

Defense counsel largely focused on Gaskin's escalating behavior during the incident and Newson's actions in self-defense. Counsel argued that the State failed to show that Newson acted with the requisite intent for second-degree murder because the evidence showed that Newson had no ill will, hatred, or spite towards Gaskin and simply wanted to leave the situation. In doing so, Newson's defense counsel addressed and rebutted the prosecutor's arguments that Newson's post-shooting actions were probative of his state of mind. Defense counsel also addressed the "I'm da shit" text message. Counsel highlighted Newson's testimony that he did not author the text and only forwarded it, and argued that the State's contention that Newson was the author simply did not make sense. Counsel pointed out that there was no way for Newson to know independently that Gaskin had passed away because Newson was in hiding, Gaskin died at the hospital, and Newson was not at the hospital. Counsel argued that, therefore, someone had to have sent Newson the news that Gaskin had died, which Newson then forwarded to Goble.

Ultimately, the jury found Newson guilty of second-degree murder. The state trial court denied Newson's motion for a new trial and sentenced Newson to life imprisonment. Newson's direct appeal raised issues not relevant here. The Florida Fifth District Court of Appeal ("Fifth DCA") <u>per curiam</u> affirmed Newson's conviction and sentence. <u>Newson v. State</u>, 94 So. 3d 608, *1 (Fla. 5th

Dist. Ct. App. 2012) (table) (unpublished).

## C.     State Post-Conviction Proceedings

Newson pro se filed a motion for post-conviction relief under Florida Rule

of Criminal Procedure 3.850, raising four claims of ineffective assistance of trial

counsel, none of which are relevant here.  Following an evidentiary hearing, the

state court denied the 3.850 motion.  Newson appealed.

Newson pro se filed an appeal brief raising six issues, including that the state

court erred in failing to appoint Newson counsel for the 3.850 evidentiary hearing.

The Fifth DCA per curiam affirmed the denial of Newson's 3.850 motion.[2]

Newson v. State, 160 So. 3d 455, *1 (Fla. 5th Dist. Ct. App. 2015) (table)

(unpublished).

## D.     Federal Habeas Proceedings

In June 2015, Newson pro se filed a 28 U.S.C. § 2254 petition and a

memorandum of law, in which he raised five claims of ineffective assistance of

trial and appellate counsel.  In pertinent part, Newson's § 2254 petition alleged that

his trial counsel ineffectively failed (1) to investigate and call as a witness

Newson's niece Angel, who supposedly would have been willing to testify at trial

---

[2]While his 3.850 motion was pending, Newson pro se filed a state habeas petition
alleging four claims of ineffective assistance of appellate counsel, none of which are raised here.
The Fifth DCA denied the petition.  Newson v. State, No. 5D14-3048 (Fla. 5th Dist. Ct. App.
2015).  Newson then filed a second petition for writ of habeas corpus in the Fifth DCA alleging a
manifest injustice, which the Fifth DCA denied.  Newson v. State, No. 5D15-1468 (Fla. 5th Dist.
Ct. App. 2015).

that she was the one who sent Newson the "I'm da shit" text message (Claim 1)
and (2) to investigate and obtain Newson's phone records, which supposedly
would have shown that he received the text message from his niece Angel and
forwarded it to Gobel  (Claim 2).[3]  Newson alleged that he repeatedly asked trial
counsel to speak with Angel and to obtain his phone records but that counsel failed
to do so and "wholly left [him] without a defense[] to the offense charged."

Newson conceded that he had not raised these two claims in any prior state
proceedings but contended that his procedural default was excused under Martinez.
See Martinez v. Ryan, 566 U.S. 1, 132 S. Ct. 1309 (2012).  In his memorandum of
law, Newson reiterated his allegations and further explained that his procedural
default was excused under Martinez because he had proceeded without counsel in
the state post-conviction proceedings and his ineffectiveness claims were
substantial.

In response, the State argued, inter alia, that the two claims were
procedurally barred and that Newson had not met his burden under Martinez,
because his underlying ineffectiveness claims were meritless.

Newson filed a reply and attached a recently executed affidavit from his
niece Angel.  In her November 2015 sworn affidavit, Angel stated that she wrote

_____

[3]Newson's § 2254 petition is not sworn to before a notary or any person authorized to
administer oaths.  Thus, his allegations therein are not verified.

11

the text message on her cell phone "within minutes of hearing about the shooting from friends" and was "responsible for sending out the text message" to Newson and others. Angel stated that "[t]he text message [she] wrote said something to the effect of 'Just in, Mrs. Queen['s] Son has been sho[t]. Be careful in these[] streets.'" She stated that her cell phone signature at the time was "IM THE SHYT."[4] In her affidavit, Angel never said that she was available at the time of the 2010 trial or that she would have come to trial and testified to the affidavit's contents.

In a September 2018 order, the district court denied Newson's § 2254 petition. Of relevance, the district court found that Claims 1 and 2 were procedurally barred and that Newson failed to meet his burden under Martinez to excuse the bar because his ineffective assistance claims were not "substantial." The district court found that, while Newson now attached Angel's affidavit to his reply brief, nothing in her 2015 affidavit reflected that she would have testified at the 2010 trial as to its contents regarding the origin of the text message. The district court concluded that, therefore, Newson's unsupported allegation that Angel would have testified at trial to the text's origin was too speculative to prove prejudice.

---

[4]While not identical, this is similar to the "I'm da shit" phrase used in the subject text message as introduced at trial.

12

The district court also found that Newson's contention—that he was left with no defense on this matter—was unsupported. The district court noted that defense counsel had elicited Newson's and Gobel's testimony regarding the text message and argued in closing that Newson could not have drafted the 5:27 p.m. text message because he could not have known at that point that Gaskin had died unless someone else told him. The district court concluded that defense counsel's "tactical decision to prove that the State's position on the text message" made no sense was not so "patently unreasonable that no competent attorney would have chosen it" and that defense counsel's decision not to call Angel as a witness or to obtain Newson's phone records was not an unreasonable determination in review of the record. Accordingly, the district court determined that, because Newson failed to show that he was prejudiced by defense counsel's alleged failures, he failed to show that his claims were "substantial" under Martinez and his claims remained procedurally barred. The district court denied Newson's § 2254 petition. This appeal and the above COA grant followed.

## II. DISCUSSION

In this appeal, Newson does not dispute that he failed to raise his two instant ineffective assistance claims in the state court proceedings. The district court thus correctly determined that Newson had not properly exhausted these claims and that

13

they were procedurally defaulted.[5]  See Bailey v. Nagle, 172 F.3d 1299, 1302–03

(11th Cir. 1999) (stating that a federal claim is subject to procedural default where

the petitioner failed to properly exhaust it in state court, and it is obvious that the

unexhausted claim would now be barred under state procedural rules).

## A.    Cause and Prejudice

To overcome the procedural-default bar, Newson must demonstrate cause

for the failure to present his ineffective assistance claims and actual prejudice from

the default.  Id. at 1306.  In Martinez, the Supreme Court held that a federal

petitioner may establish cause for his procedural default in a federal habeas

proceeding where (1) the petitioner had no counsel, or had ineffective assistance of

counsel, in the state collateral proceedings and (2) the petitioner "demonstrate[s]

that the underlying ineffective-assistance-of-trial-counsel claim is a substantial

one, which is to say that the prisoner must demonstrate that the claim has some

merit."  556 U.S. at 13–14, 132 S. Ct. at 1318.

## B.    Strickland Principles

To succeed on an ineffective assistance claim under Strickland v.

Washington, a § 2254 petitioner must show that his Sixth Amendment right to

counsel was violated because (1) his attorney's performance was deficient, and

---

[5]"When reviewing the district court's denial of a habeas petition, we review questions of law and mixed questions of law and fact de novo, and findings of fact for clear error."  Nyland v. Moore, 216 F.3d 1264, 1266 (11th Cir. 2000).

14

(2) the deficient performance prejudiced his defense.  466 U.S. 668, 687, 697, 104 S. Ct. 2052, 2064, 2069 (1984).  "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."  Id. at 690, 104 S. Ct. at 2066.  Counsel's performance is deficient only if it falls below the wide "range of competence demanded of attorneys in criminal cases."  Id. at 687, 104 S. Ct. at 2064 (quotation marks omitted).  "To perform within constitutional bounds, defense counsel must conduct a reasonable investigation in relation to their representation."  Borden v. Allen, 646 F.3d 785, 818 (11th Cir. 2011).  Counsel's decision to pursue one line of defense over another is "ineffective only if it was so patently unreasonable that no competent attorney would have chosen it."  Adams v. Wainwright, 709 F.2d 1443, 1445 (11th Cir. 1983).

Prejudice is established by a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Strickland, 466 U.S. at 694, 104 S. Ct. at 2068.  The petitioner must affirmatively prove prejudice by demonstrating that the unprofessional errors were so egregious as to render the trial unfair and the verdict suspect.  Johnson v. Alabama, 256 F.3d 1156, 1177 (11th Cir. 2001).

## C.    Analysis

Here, the district court did not address the performance prong but ruled only

15

on the prejudice prong of <u>Strickland</u>.  We too find it unnecessary to address

defense counsel's performance because the record so amply supports the district

court's finding that Newson was not prejudiced by defense counsel's failure to call

his niece Angel as a witness or to introduce Newson's phone records to rebut the

State's theory that he authored and sent the "I'm da shit" text message to Gobel.[6]

<u>See</u> <u>Strickland</u>, 466 U.S. at 694, 104 S. Ct. at 2068.

First, as the district court pointed out regarding Claim 1, while Angel stated

in her 2015 affidavit that she wrote the subject text message on her cell phone with

her "IM THE SHYT" signature and sent the text to Newson, Angel did not state

that she would have been available to testify at Newson's 2010 trial or that she

would have gone to trial and testified as to the affidavit's contents.  Although

Newson's § 2254 petition alleged that Angel would have been willing to testify at

trial that she sent the text message, his unsworn and unverified allegations are

insufficient.  <u>See</u> <u>Karcher v. Wainwright</u>, 476 F.2d 179, 180 (5th Cir. 1973)

(explaining that unverified factual allegations in habeas filings need not be

---

[6]In this appeal, Newson attaches to his initial and reply briefs copies of Angel's sworn affidavit and Gobel's Phone Records for January 7, 2009, the date of the shooting.  Those Phone Records are the same as the "Phone Records" Newson attached to one of his state post-conviction motions.

In its response to Newson's § 2254 petition, the State included Newson's post-conviction motion with those same "Phone Records."  Thus, those "Phone Records," and Angel's sworn affidavit, were already in the record before the district court.

16

considered).[7]

Second, even if Angel had testified to the contents of her affidavit, her testimony was still different from Newson's own testimony. Newson testified that someone else sent the text message to Angel's phone and that she forwarded it to Newson. In contrast, Angel in her affidavit stated that she wrote the text message herself on her phone and sent it to Newson. In this way, Angel's alleged testimony could have undermined Newson's credibility. In any event, because Newson has not shown that Angel would have testified at his trial, he has failed to establish by a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694, 104 S. Ct. at 2068; see Chandler v. United States, 218 F.3d 1305, 1316 n.20 (11th Cir. 2000) (en banc) (stating that "the mere fact that other witnesses might have been available or that other testimony might have been elicited from those who testified is not a sufficient ground to prove ineffectiveness of counsel" (quotation marks and alteration omitted)).

Third, as to Claim 2, Newson never submitted his own phone records to the district court. Newson argues that he provided defense counsel with the necessary information to obtain the records and that it was counsel's job, given his position

---

[7]This Court adopted as binding precedent all Fifth Circuit decisions prior to October 1, 1981. Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

17

and access to resources, to obtain the records.  Nevertheless, without the records, it is purely speculative whether they would have been beneficial or harmful to his defense.  Without Newson's phone records, he again has failed to establish by a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Strickland, 466 U.S. at 694, 104 S. Ct. at 2068.

Fourth, as per Newson's own § 2254 allegations and his arguments on appeal, the main evidentiary value of Angel's testimony and Newson's phone records would have been to prove that Newson did not author the text message or the "I'm da shit" line within it, and therefore did not brag about killing Gaskin or have any ill will.  Yet, even if Newson did not author that text message, there was other overwhelming evidence demonstrating Newson's guilty and untoward intent.  Newson shot Gaskin at close range, within six inches to one foot.  Newson admitted that he did not see Gaskin armed with a gun, knife, or other weapon.  Newson hid from police, did everything he could to cover up his crime, and initially denied even shooting Gaskin.  Plus, Newson sent multiple other text messages to Goble that showed his cavalier attitude despite his recent involvement in a shooting.  Thus, Newson has not shown that, but for defense counsel's failure to introduce additional evidence regarding the "I'm da shit" text message, the result of the proceeding would have been different.  Id. at 694, 104 S. Ct. at 2068.

18

And, finally, defense counsel at trial did vigorously proffer a defense for Newson.  Namely, in rebuttal to the State's argument regarding Newson's intent, defense counsel argued at length that Gaskin's behavior escalated during the incident, that Newson had no ill will towards Gaskin and simply wanted to leave the situation, and that Newson's post-shooting actions were not probative of his state of mind when he shot Gaskin.  These arguments were supported by the evidence, especially Newson's and Gobel's testimony.  All in all, while Newson now argues that defense counsel should have used other evidence and made a different argument to rebut the State's position on the subject text message, he has failed to show that these changes would have made a difference in the outcome of his trial.[8]  Id. at 694, 104 S. Ct. at 2068.

Therefore, the district court properly determined that Claims 1 and 2 were procedurally defaulted because Newson did not show that his ineffectiveness claims were "substantial" under Strickland in order to overcome the default.  See Martinez, 556 U.S. at 13–14, 132 S. Ct. at 1318; Bailey, 172 F.3d at 1302–03, 1306.

---

[8]Newson argues that the fact that he was convicted ultimately confirms that defense counsel was ineffective.  Contrary to Newson's contention, we have explained that the fact that a particular defense ultimately was unsuccessful does not demonstrate ineffectiveness.  See Chandler, 218 F.3d at 1314.

## III. CONCLUSION

Because the district court did not err in dismissing Claims 1 and 2 as procedurally defaulted, we affirm the denial of Newson's § 2254 petition on that basis.

**AFFIRMED.**